IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MORRIS SANDERS,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        CASE NO.: 2:16-cv-637-WKW-GMB
                                         )        [WO]
WAL-MART STORES EAST, LP,                )
                                         )
        Defendant.                       )
_____        )
MORRIS SANDERS,                          )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        CASE NO.: 2:17-cv-31-WKW-GMB
                                         )
WAL-MART STORES EAST, LP,                )
                                         )
        Defendant.                       )

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b)(1), this case was referred to the undersigned United States Magistrate Judge for review and submission of a report with recommended findings of fact and conclusions of law. Doc. 3.  On August 2, 2016, Plaintiff Morris Sanders, proceeding *pro se*, brought suit alleging a number of claims arising out of his employment at a Walmart retail store in Selma, Alabama. Doc. 1.  Sanders filed an amended complaint on December 2, 2016. Doc. 24.  On January 12, 2017, Sanders filed a separate—though closely related—lawsuit, which was consolidated with this action on March 3, 2017. *See* Doc. 34.  At this time, both the Amended Complaint (Doc. 24) in the lead case and the Equal Employment Opportunity Commission ("EEOC") Complaint (Doc. 1) in the

member case are Sanders' operative pleadings.[1]

Now before the court is the Motion for Judgment on the Pleadings or in the Alternative Motion for Summary Judgment filed by Defendant Wal-Mart Stores East, L.P. ("Walmart"). Doc. 57. Walmart has also filed a motion to strike (Doc. 71) portions of an affidavit Sanders submitted in support of his claims. With briefing complete, the motions are now ripe for disposition. After careful consideration of the parties' submissions, the applicable law, and the record as a whole, the undersigned recommends that the motion for judgment on the pleadings (Doc. 57) be GRANTED in part and DENIED in part, that the motion for summary judgment (Doc. 57) be GRANTED, and that all of Sanders' claims be DISMISSED with prejudice. The undersigned further recommends that the objections contained in the motion to strike (Doc. 71) be SUSTAINED in part and OVERRULED in part, as explained below.

## I. JURISDICTION AND VENUE

The court has subject-matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both.[2]

---

[1] For simplicity, the court will refer to the Amended Complaint from *Morris Sanders v. Wal-Mart Stores East, LP*, 16-cv-637, as the "First Complaint" and the EEOC Complaint from *Morris Sanders v. Wal-Mart Stores East, LP*, 17-cv-31, as the "Second Complaint." Unless otherwise specified, all citations to document numbers are from the case styled as 16-cv-637.

[2] Despite the fact that many of the events giving rise to Sanders' claims occurred in the Southern District of Alabama, venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). Walmart has not contested venue and is deemed to reside in the Middle District of Alabama because its contacts with the district are "sufficient to subject it to personal jurisdiction if that district were a separate State." 28 U.S.C. § 1391(d). In addition, the court affords deference to Sanders' choice of forum, particularly in light of his *pro se* status and the proximity of his home in Selma to this court's location in Montgomery. *See, e.g.*, *Gould v. Nat'l*

## II.  STANDARDS OF REVIEW

### A.    Motion to Strike

Walmart seeks an order striking portions of Sanders' affidavit (Doc. 69-1).  Under Rule 12 of the Federal Rules of Civil Procedure, the "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  But affidavits are not pleadings, so a motion to strike is not the proper vehicle for Walmart's stated goal. *See Lowery v. Hoffman*, 188 F.R.D. 651, 653 (M.D. Ala. 1999); Fed. R. Civ. P. 7(a).

However, federal courts "often treat a party's motion to strike certain evidence as an objection to that evidence's admissibility." *Taylor v. City of Gadsden*, 958 F. Supp. 2d 1287, 1291 (N.D. Ala. 2013); *see also Zottola v. Anesthesia Consultants of Savannah, P.C.*, 169 F. Supp. 3d 1348, 1357 (S.D. Ga. 2013) ("[C]ourts tend to treat motions to strike as objections to the challenged portions of affidavits."); *Ross v. Corp. of Mercer Univ.,* 506 F. Supp. 2d 1325, 1333–34 (M.D. Ga. 2007) (same).  This course of action is supported by the 2010 revision of Rule 56 of the Federal Rules of Civil Procedure, which now provides that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  It also allows the court to disregard portions of an affidavit or declaration if the remainder of the document is admissible. *See, e.g.*, *Short v. Mando Am. Cop.*, 805 F. Supp. 2d 1246, 1265 (M.D. Ala. 2011).  As a result, the court will construe Walmart's requests to strike as

---

*Life Ins. Co.*, 990 F. Supp. 1354, 1357–58 (M.D. Ala. 1998) (observing that "the plaintiff's choice of forum should not be disturbed" unless it is "clearly outweighed by other considerations").

objections under Rule 56(c)(2) and will consider the objections simultaneously with the summary judgment motion.[3] *See Taylor*, 958 F. Supp. 2d at 1291; *Campbell v. Shinseki*, 546 F. App'x 874, 879 (11th Cir. 2013) ("The plain meaning of [the Rule 56 amendments] show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now part of summary judgment procedure, rather than a separate motion to be handled preliminarily.") (citation omitted).

## B.     Motion for Judgment on the Pleadings

"Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Palmer & Cay, Inc. v. Marsh & McLennan Cos., Inc.*, 404 F.3d 1297, 1303 (11th Cir. 2005) (citation and internal quotation marks omitted).  This standard is functionally the same as the standard for a Rule 12(b)(6) motion to dismiss. *See United States v. Bahr*, 275 F.R.D. 339, 340 (M.D. Ala. 2011).  Thus, the court must accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff. *Mergens v. Dreyfoos*, 166 F.3d 1114, 1117 (11th Cir. 1999).  To avoid judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).

---

[3] In this case, the "objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2), advisory comm. note to 2010 amendment.

**C.      Motion for Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the non-movant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249−50 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all

the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the non-movant "fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## III. STATEMENT OF FACTS

The following facts are undisputed except as noted. Sanders is a resident of Selma, Alabama, and has been employed by Walmart on three separate occasions, most recently from 2008 to 2016. Docs. 53-1 at 9 & 58-3 at 3. Sanders is a 51-year-old black man. Docs. 53-1 at 9–10 & 58-6 at 2.

Walmart operates retail stores throughout the United States. Sanders worked at Walmart's store in Montgomery, Alabama, before he was transferred to Selma in February 2010. Doc. 24 at 3. Sanders has held a variety of positions, including overnight maintenance supervisor, consumer department manager, support manager, people greeter,

and pharmacy sales associate. Doc. 24 at 3.  Matthew Joiner[4] was the manager of Walmart's Selma location from September 19, 2015 to June 9, 2017, when Walmart transferred him to a different store. Doc. 58-2 at 2.

## A.    Walmart's Leave and Accommodation Request Policies

Under Walmart's leave policy, employees must submit certain documentation to Sedgwick, a third-party administrator that processes employee leave-of-absence requests. Doc. 58-3 at 6.  When a Walmart employee requests leave—whether pursuant to the Family and Medical Leave Act ("FMLA") or otherwise—the request is conditionally approved pending the employee's submission of certification documentation. Doc. 58-2 at 3. Absences, late arrivals, or early departures (all of which Walmart categorizes as "exceptions") during the conditionally-approved time period may be retroactively approved or denied by Sedgwick. Doc. 58-2 at 3.

Certain disability-related accommodation requests, on the other hand, may be approved by store management. Doc. 58-4 at 5.  Otherwise, accommodation requests are referred to the Accommodation Service Center ("ASC"), a "department within Walmart that receives, processes and makes determinations on job accommodation requests that may not be authorized at the store level."[5] Doc. 58-4 at 3.  When an employee requests an accommodation that cannot be approved in the store, management provides the requesting

---

[4] Sanders refers to Joiner as "Matt Joyner" in his filings.
[5] On-the-job assistance requests that can be approved by store management include providing stools; exceptions to the dress code; allowing employees to bring personal assistive devices; and accommodations related to food and drink, parking, and scheduling. *See* Doc. 58-4 at 22–23.  Other requests, like Sanders' eventual request to use a cart reserved for disabled customers, are "forwarded to ASC for review, analysis and decision." Doc. 58-4 at 23.

employee with a "Request for Accommodation Packet." Doc. 58-4 at 5.  Included in the packet is a form entitled "Request for Accommodation," which the employee must provide to ASC, as well as a medical questionnaire. Doc. 58-4 at 5.  If an employee is unable to submit the request form, the store manager can either assist the employee with the form or communicate the accommodation request directly to ASC. Doc. 58-4 at 5.

When ASC receives an accommodation request, it may or may not seek additional medical information from the employee. *See* Doc. 58-3 at 45 ("If the associate's disability or medical condition is known or otherwise obvious, ASC may not need to request medical information.  Otherwise, medical information may be requested to help understand the nature of the associate's medical condition or disability . . . .").  Employees have 15 days to provide the requested information, and the accommodation request is administratively closed if the employee does not meet this deadline. Doc. 58-3 at 45.  However, a new request may be submitted at any time. Doc. 58-3 at 45.  If ASC determines that a requested accommodation is reasonable, it will approve the accommodation and inform the employee. Doc. 58-3 at 46.  If ASC cannot identify a reasonable accommodation that would allow an employee to perform the essential functions of his or her job, it may recommend reassignment to a new position. Doc. 58-3 at 46.  To be reassigned, the employee must be qualified for the position and able to perform the essential functions of the position with or without a reasonable accommodation. Doc. 58-3 at 46.  If no position is immediately available, ASC will search at least once per week for 12 weeks for a suitable position. Doc. 58-3 at 47.  While waiting for reassignment, an employee may use any paid time off or other income replacement benefits to which he or she is eligible. Doc. 58-3 at 46.

The new position is generally equivalent in pay and level of responsibility to the requesting employee's current job, but it could be a lower-level position. Doc. 58-3 at 46. ASC will not create a new position to reassign an employee. Doc. 58-3 at 46. Employees also have the ability to seek reconsideration of ASC's reassignment determination. Doc. 58-3 at 47. If ASC has not identified a suitable position for reassignment within 12 weeks, the employee is terminated. *See* Doc. 58-3 at 46–47.

## B.  Sanders' 2015 Accommodation Request

Sanders has experienced back injuries since at least 2013. Docs. 24 at 3–4 & 69-1 at 1. He missed work after aggravating a job-related injury while on vacation in 2014, and upon his return he was limited to lifting objects weighing no more than 40 pounds. Doc. 24 at 4. Later, on October 7, 2015, while serving as a Customer Availability Process ("CAP") Team associate, Sanders filed an accommodation request seeking continuous leave from October 8, 2015 to October 28, 2015.[6] Doc. 58-10 at 2. The request was accompanied by a medical questionnaire from Sanders' physician indicating that Sanders could return to work but that he was limited to lifting no more than 10 pounds and could not pull, stretch, reach, or strain.[7] Docs. 24 at 5, 58-5 at 16 & 58-12. Because these restrictions interfered with Sanders' ability to perform the functions of the CAP Team associate position—which included lifting up to 50 pounds—ASC reassigned him to the

---

[6] Walmart's interrogatory responses indicate that Sanders' request was for October 8 to November 6. *See* Doc. 58-5 at 15–16. Walmart has provided no explanation or clarification for this discrepancy.
[7] The attending physician statement was originally illegible and was revised and resubmitted to ASC on October 14, 2015.

position of people greeter on October 26.[8] Doc. 58-5 at 16.  His reassignment request was then closed. Doc. 58-15.  Sanders served as a greeter for approximately 12 weeks. Doc. 24 at 6.

After he was reassigned, Sanders filed his first charge of discrimination with the EEOC on April 20, 2016. Doc. 58-6 at 2.  In the EEOC charge, Sanders referenced his October 2015 accommodation request, stating that he had been subjected to discrimination on the basis of his disability. Doc. 58-6 at 2.  After receiving a Dismissal and Notice of Rights—commonly known as a right-to-sue letter—from the EEOC on May 6, 2016, Sanders brought suit in this court on August 2, 2016.

C.    **Sanders' 2016 Accommodation Request**

On March 5, 2016, Joiner promoted Sanders to the position of overnight maintenance supervisor. Docs. 58-2 at 3 & 58-3 at 3.  In this role, Sanders became a department manager and his hourly pay increased from $11.74 to $13.41. Doc. 58-2 at 3. At some point thereafter, Sanders aggravated his back injury on the job while picking up a box. Doc. 24 at 6.  As a result, Sanders made regular trips to his primary care physician and the emergency room. Doc. 24 at 7 & 58-1 at 47.  Sanders requested FMLA leave and his primary-care physician, Dr. Singh, submitted a medical certification for intermittent leave from April 8, 2016 through March 31, 2017. Doc. 58-16.  Sedgwick approved Sanders' request for intermittent leave, permitting "1-2 episode(s) per 4 Week(s) or 1 Month(s) with each episode lasting up to 8-16 Hour(s) or 1-2 Day(s)" from March 3, 2016

---

[8] Sedgwick determined that Sanders was eligible to be a people greeter or fitting room associate, but initially neither position was available. *See* Docs. 58-4 at 8.

through September 2, 2016. Doc. 58-17 at 2.  The letter from Sedgwick informed Sanders that the approval would expire on September 2 and that he would need to contact Sedgwick and prepare a medical certification form to request an extension. *See* Doc. 58-17 at 2. Walmart's leave policy in place at the time stated that a failure to submit certification in a timely fashion could result in a delay or denial of FMLA leave. *See* Doc. 58-3 at 36.

This injury also forced Sanders to take conditionally-approved continuous leave from June 13, 2016 to July 12, 2016, after which he returned to work as an overnight maintenance supervisor. Doc. 58-2 at 4.  Upon his return on August 15, 2016, Sanders was officially approved for normal duty by Dr. Michael Davis, a worker's compensation doctor to whom Walmart referred him. Docs. 58-2 at 10 & 69-1 at 3.  Dr. Davis later approved Sanders for normal duty in September and October 2016.[9] Doc. 58-2 at 11–12.  During this period and without permission from the store's management, Sanders began using an electric cart reserved for disabled customers in an effort to alleviate his pain. *See* Doc. 58-1 at 43.  Eventually Sanders was directed by management not to use the cart because Walmart does not permit its employees to use customer carts. Doc. 58-1 at 47; *see also* Doc. 58-4 at 5.  Sanders nevertheless continued to use the cart because he believed that other employees were doing so. Doc. 58-1 at 47 ("I felt like it was unfair that I was asked to get out when there [were] other people utilizing [the] cart.").  Sanders believed a co-worker named Cedric Hamilton was also using a customer cart, but does not know if

---

[9] Sanders disputes Dr. Davis's conclusion that he was healthy enough to work. *See* Doc. 58-1 at 43 ("I disputed that Walmart worker's comp[ensation] doctor told me I could go back to full duty.  I told him I was in a tremendous amount of pain.").

Hamilton had permission or was also told not to use one. Doc. 58-1.  Sanders assumed that Hamilton was permitted to use the cart because, unlike Sanders, he had not lodged prior complaints with the EEOC. Doc. 58-1 at 48.  Joiner, however, had no knowledge of Hamilton ever using a cart. Doc. 58-2 at 5.

Once Sanders' supervisors became aware that he was using the cart, assistant manager Marquis Willis informed Joiner of the situation. Doc. 58-2 at 4.  Because this was not one of the accommodations that could be approved by store management, *see* Doc. 58-4 at 23, Joiner provided Sanders with an accommodation request form to submit to ASC. Doc. 58-2 at 4.  Sanders could not submit the documentation, so Joiner notified ASC to open a formal accommodation request related to Sanders' desire to use the customer cart. Doc. 58-2 at 4; *see also* Doc. 58-18.  While the request was pending, Joiner placed Sanders on a leave of absence. Doc. 58-2 at 4; *see also* Doc. 58-21.  Joiner then contacted Joe Rubino, a manager at ASC, informing Rubino that Sanders believed that he could not perform his job without using the cart. *See* Doc. 58-2 at 16.  After noting that Walmart "did not have any medical information that would justify keeping [Sanders] off work," Rubino determined that Joiner should give him the choice of returning to work without use of the cart or applying for a leave of absence. Doc. 58-2 at 15.  Rubino also informed Joiner that Sanders could bring in his own motorized cart as a job aid. *See* Doc. 58-2 at 18. Additionally, Sanders spoke directly with ASC. *See* Doc. 58-1 at 44.

Eventually, Sanders abandoned this accommodation request and informed ASC and Joiner on October 6, 2016 that he wanted to return to work. *See* Docs. 58-1 at 48 & 58-2 at 5.  Sanders terminated his request because he could not submit medical documentation

demonstrating his need for an accommodation. *See* Doc. 58-2 at 5.  In his deposition, Sanders gave two explanations for his inability to submit the documentation.  First, he said that his own physician, Dr. Singh, was unable to complete the medical questionnaire because Sanders also had a worker's compensation physician assigned by Walmart. *See* Doc. 58-1 at 44 ("I think that's why he didn't fill it out, because I was under a worker's comp[ensation] doctor.  That's probably why it didn't get filled out.  I don't know for sure.").  Alternatively, he stated that he was "instructed by Walmart" that he "could not use [his] personal physician," and instead was referred by Walmart to Dr. Davis. Doc. 69-1 at 3; *see also* Doc. 58-1 at 44 ("[Sanders' primary care physician] don't [sic] override workmen's comp[ensation] doctor.  So I had to go to [Dr. Davis] . . . . He don't do paperwork was his words [sic].").  According to Sanders, Dr. Davis declined to verify that his injury caused his prior absences and limited his ability to work. *See* Docs. 69-1 at 3 & 58-1 at 43 ("[T]here was a Walmart workmen's comp[ensation] doctor [Dr. Davis] and every time I [got] into specifics about my pain, he would leave out of the office and send his nurse in and send me out.").

D.    **Termination**

On October 11, 2016, Joiner learned that Sanders' requested FMLA leave had been denied for all absences after September 6, 2016 because Sanders failed to provide the necessary medical recertification information.[10] Doc. 58-1 at 35–36; Doc. 58-2 at 5 & 20.

---

[10] Sanders also testified that he believed Dr. Singh was responsible for submitting the medical certification. *See* Doc. 58-1 at 36.  However, Sanders conflated his FMLA leave request with his 2016 accommodation request when discussing Dr. Singh's role and responsibility for submitting the required documentation. *See, e.g.*, Doc. 58-1 at 44.

Joiner was unsure which of Sanders' other leave requests Sedgwick had denied, so he checked ViaOne, the portal that tracks employee leave requests, to see which dates Sedgwick had approved and denied. Doc. 58-2 at 6.   Joiner recorded each approval and denial and entered those dates into Walmart's employee attendance-tracking system. Doc. 58-2 at 6.   Ultimately, Sedgwick denied Sanders' request for FMLA leave for three days in May, 16 days in June, nine days in July, 13 days in August, and 14 days in September 2016. Doc. 58-2 at 6.   These denials increased Sanders' unexcused absences from eight to 63 during the six-month period from April to October 2016. Doc. 58-2 at 6.

Walmart's Field Attendance and Punctuality Policy, which was implemented on March 5, 2016, tracks absences in terms of "occurrences." Doc. 58-3 at 5.  Under the policy, unexcused absences, late arrivals of more than two hours, and early departures of more than two hours result in one occurrence; absences without any advance warning result in three occurrences; and a late arrival or early departure of two hours or less results in half of an occurrence. Doc. 58-3 at 5–6.  The policy states that an accumulation of nine or more occurrences in any rolling six-month period subjects an employee to termination. Doc. 58-3 at 6.  The policy also warns employees that any leave requests denied by Sedgwick or accrued after the last-approved day of a leave-of-absence period count as occurrences unless the absences are otherwise authorized. Doc. 58-3 at 6.

On October 28, 2016, Joiner and co-manager Angie Relph met with Sanders and terminated his employment. Doc. 58-2 at 7.   Joiner informed Sanders that because Sedgwick had denied several previous leave-of-absence requests, he had accrued 63 unexcused occurrences, violating Walmart's attendance policy. Doc. 58-2 at 7.   In his

deposition, Sanders confirmed that he was told that he was terminated because of his violation of the attendance policy. Doc. 58-1 at 35.

## E.    Sanders' Discrimination Allegations

Sanders' complaints and deposition testimony are not models of clarity.  In the First Complaint, Sanders alleges that in March 2015 he was placed on medical leave and replaced with a white employee, who apparently also had been injured, because Sanders wore braces on his back and neck. *See* Doc. 24 at 5.  Sanders also cites to an "inappropriate encounter" with a manager, Ms. Peetsy, which occurred "in front of customers and other employees." Doc. 24 at 6.  He claims that while working as an overnight maintenance supervisor in 2016, Joiner intentionally gave him physically demanding tasks despite knowing that he was injured. *See* Doc. 24 at 6–7 ("Soon, Mr. Joyner [sic] started leaving notes with overnight management that was [sic] designed to keep members of maintenance busy, in order to ensure that Plaintiff was personally performing the task that Mr. Joyner [sic] had assigned to Plaintiff.").  Finally, Sanders alleges that Cedric Hamilton used the same type of customer cart that Sanders was prohibited from using. *See* Doc. 24 at 7 ("Cedric Hamilton had been [using a cart] prior to Plaintiff without filing for accommodations and had no complaints over his use.").

In the second EEOC charge filed in December 2016, Sanders explained that two coworkers, "Sherman Pritchett and Janice," had "attendance problem[s]" but were presumably not terminated. *See* Doc. 1-1 at 3 (17-cv-31).  He also stated that he "felt like" Joiner "fav[ored] whites better than . . . [people] of color (Black)." Doc. 1-1 at 3 (17-cv-31).  Sanders explained that Hamilton was permitted to use an employee cart because

Hamilton is "light skin[ned]" and Joiner "seem[s] to have [a] problem with color." Doc. 1-1 at 3 (17-cv-31).

Many of these allegations are not mentioned in Sanders' evidentiary submissions, which consist of an affidavit and his deposition testimony. *See generally* Docs. 58-1 & 69-1. In the affidavit, Sanders stated that he was prescribed a back brace and repeated his assertion that Joiner assigned him physically demanding work while he was injured. Doc. 69-1 at 2. He also admitted to using carts reserved for disabled customers while the store was closed. Doc. 69-1 at 2. Finally, he alleged that Walmart would not permit him to see Dr. Singh for his 2016 accommodation request and that Dr. Davis gave short shrift to his complaints of pain while reporting that he was healthy enough to work. Doc. 69-1 at 3.

When asked in his deposition to describe his evidence that Walmart's decision to terminate him was based on his disability, Sanders responded that "every time I asked for [an] accommodation . . . I was sent home. They wouldn't allow me to be accommodated." Doc. 58-1 at 36. With regard to his first request for an accommodation in 2015, Sanders believes that the delay between his request and the reassignment constituted unlawful discrimination. *See* Doc. 58-1 at 37. Sanders did not dispute that he was terminated in 2016 for violating Walmart's attendance policy after accruing 63 unexcused absences as a result of denied leave requests. *See* Doc. 58-1 at 35–36. However, he testified that the termination was in retaliation for filing a charge of discrimination with the EEOC in April 2016, and that other employees also violated Walmart's attendance policy who were not terminated. *See* Doc. 58-1 at 38 & 42 (responding, when asked what evidence he has that his termination was due to the April 2016 EEOC charge, "Because I filed it"). Sanders did

not explain when these coworkers broke Walmart's attendance policy, which policy was in effect when they did so, and how he knew that they had accrued more occurrences than they were allowed. *See* Doc. 58-1 at 38.  He also testified that several coworkers' injuries were accommodated while he was not allowed to wear braces on his neck and back to work. *See* Doc. 58-1 at 39.  However, Sanders admitted that no one at Walmart told him that he could not wear a brace at work. *See* Docs. 58-1 at 36 & 58-2 at 7.

## IV.  DISCUSSION

**A.    Motion for Judgment on the Pleadings**

### *1.    Scope of the Complaints*

Walmart contends that Sanders has asserted claims in both complaints that do not arise out of the allegations contained in the respective charges of discrimination. *See* Doc. 65 at 12–16.

#### a.    Title VII

First, Walmart argues that any Title VII claim in either complaint must fail because race discrimination was not alleged in either underlying charge of discrimination. *See* Doc. 65 at 14–15.  It is well established that a plaintiff's federal-court complaint in Title VII cases is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dept. of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (citation and internal quotation marks omitted). Therefore, allegations in a judicial complaint may "amplify, clarify, or more clearly focus in the allegations in the EEOC complaint," but allegations of new acts of discrimination are prohibited. *Id.* at 1279–80 (citation and internal quotation marks omitted).

According to Walmart, the EEOC investigation that followed the EEOC charge underlying the First Complaint could not reasonably have been expected to examine whether Sanders was discriminated against on the basis of race.  The court agrees.  In the charge, Sanders checked the boxes next to "retaliation" and "disability" and stated, "I believe I that I have been discriminated against on the basis of my disability, in violation of the Americans with Disabilities Act of 1990, as amended." Doc. 58-6 at 2.  Nowhere in the charge does Sanders make a reference to race, let alone suggest race as an additional basis for his charge.  *See* Doc. 58-6.   Accordingly, because the allegation of race discrimination in the First Complaint does not amplify, clarify, or more clearly focus the disability-based allegations in Sanders' first EEOC charge, the Judgment on the pleadings on this claim should be GRANTED and Sanders' Title VII race discrimination claim in the First Complaint is due for dismissal on the pleadings.

The Title VII claim in the Second Complaint is a different story.  While the boxes next to "race" and "color" were not selected, "the failure to check an appropriate box is not dispositive" of a plaintiff's discrimination claim. *Freeman v. Koch Foods of Ala.*, 777 F. Supp. 2d 1264, 1277 (M.D. Ala. 2011).  Instead, the "crucial element of a charge of discrimination is the factual statement contained therein." *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983).  In the second charge, Sanders contends that he suffered discrimination because he filed the original EEOC charge. *See* Doc. 1-1 at 2 (17-cv-31).  According to Sanders, this discrimination manifested itself in store management's refusal to accommodate his injury and his eventual termination. *See* Doc. 1-1 at 2–3 (17-cv-31).  However, unlike the prior charge of discrimination, this charge makes multiple

explicit references to race and color.  For example, Sanders alleged that Joiner "fav[ors] whites better than [if] it was a person of color (Black)." Doc. 1-1 at 3 (17-cv-31).  He also listed multiple white coworkers who were allegedly treated more favorably when they suffered job-related injuries. *See* Doc. 1-1 at 3 (17-cv-31).  Finally, he pointed to a black coworker, Cedrick, "a light skin[ned] male," who was also treated more favorably than Sanders, opining that "Matt [Joiner] seem[s] to have [a] problem with color."[11] Doc. 1-1 at 3 (17-cv-31).

In the Second Complaint itself, Sanders claims that he was discriminated against on the basis of his race and disability, while also citing retaliation and referencing the underlying EEOC charge. *See* Doc. 1 at 1–2 (17-cv-31).  Thus, the race discrimination claim in the Second Complaint reasonably could be expected to grow out of the race-based allegations included in the underlying charge.  Judgment on the pleadings on this claim is due to be DENIED, and the court will proceed with the summary-judgment inquiry.

### b.    Americans with Disabilities Act

In the First Complaint, Sanders alleges that he was "terminated based on his real or perceived disability," Doc. 24 at 7, while in the underlying EEOC charge he only makes mention of other acts of disability-based discrimination. *See* Doc. 58-6 at 2.  Walmart argues that the termination claim in no way amplifies, clarifies, or more clearly focuses the allegations in the underlying charge because the charge does not mention termination.

---

[11] "[C]olor discrimination is distinct from race discrimination in that the former arises when the particular hue of the plaintiff's skin is the cause of the discrimination, such as the case when a dark colored African-American individual is discriminated against in favor of a light-colored African-American individual." *Gill v. Bank of Am. Corp.*, 2015 WL 4349935, at *4 (M.D. Fla. July 14, 2015) (citations and internal quotation marks omitted).

Doc. 65 at 23–24.

Essentially, Sanders is alleging that he was initially subjected to discrimination because of his disability in October 2015, and this discrimination continued after he filed his charge of discrimination in April 2016, culminating in his termination in October of the same year. *See* Docs. 24 at 6–7 & 58-6 at 2.  In the underlying EEOC charge, Sanders checked the boxes for "retaliation" and "disability." *See* Doc. 58-6 at 3.  Sanders clarified his allegations in the Second Complaint and its underlying charge of discrimination, explicitly stating his belief that the retaliation was the result of his EEOC charge in April 2016. *See* Doc. 1-1 at 2 (17-cv-31).  Because Sanders initially filed suit in August 2016— nearly three months before he was terminated—his original complaint did not include a claim for discriminatory termination. *See generally* Doc. 1.   And Sanders later amended this complaint in part to incorporate the termination into his allegations. *See* Doc. 24 at 1– 2.  If the facts were to show that the same discriminatory treatment that caused Sanders to file his EEOC charge in April eventually led to his firing at the end of October, his discriminatory termination claim would grow out of the allegation of disability discrimination regardless of the fact that Sanders' original discrimination allegations are predicated on a failure-to-accommodate theory.

As a general rule, courts within this circuit are "extremely reluctant to allow procedural technicalities to bar claims" for employment discrimination, and "the scope of an EEOC complaint should not be strictly interpreted." *Gregory*, 355 F.3d at 1280 (citations and internal quotation marks omitted).  To conclude that Sanders' allegation that he was terminated because of his disability and for lodging a complaint with the EEOC

does not arise out of allegations that he was discriminated against on the basis of his disability would be precisely the type of strict interpretation disfavored in the Eleventh Circuit.  Moreover, courts must liberally construe EEOC charges filed by *pro se* parties. *See, e.g.*, *Rossi v. Fulton Cnty., Ga.*, 2013 WL 1213168, at *9 n.10 (N.D. Ga. Feb. 4, 2013) (compiling cases and stating that "[t]hose cases that have found claims growing out of an EEOC charge have emphasized that the plaintiff was proceeding *pro se*").  Thus, the court concludes that Sanders' discriminatory termination claim does not exceed the scope of the allegations in the underlying charge of discrimination, and recommends that the motion for judgment on the pleadings on this claim be DENIED.

### 2.   *Remaining Arguments*

The remainder of Walmart's judgment-on-the-pleadings arguments attack the sufficiency of Sanders' allegations in both complaints and his shotgun pleading style. These untimely arguments miss the mark.  It is a time-tested axiom that *pro se* complaints "are held to a less stringent standard than pleadings drafted by attorneys." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998).  Even "inartfully pleaded" *pro se* pleadings are subject to reduced scrutiny. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "Courts do and should show leniency to *pro se* litigants not enjoyed by those with the benefit of a legal education." *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998), *overruled on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010).  Moreover, when faced with a shotgun complaint, a defendant is not expected to file an answer. *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).  Instead, before responding to the complaint, "the defendant is expected

21

to move the court . . . to require the plaintiff to file a more definite statement." *Id.*

Here, Walmart chose not to file a motion for a more definite statement.  Nor did it file a motion under Rule 12 of the Federal Rules of Civil Procedure before answering the complaints or at the close of pleadings.  Instead, Walmart chose to file an answer and wait until the close of discovery to submit an all-in-one motion encompassing both a motion for judgment on the pleadings—containing arguments Walmart could have made at a much earlier stage in these proceedings—and a motion for summary judgment.  Now, with the parties having exchanged extensive discovery and with a fully-developed record before it, the court will not recommend disposing of Sanders' complaints under Rule 12. *See, e.g.*, 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1369 (3d ed. 2017) ("In light of the battery of pretrial motions available under the federal rules and the conversion provision in Rule 12(c) itself, there probably is little need for retaining judgment on the pleadings as a separate procedure for testing the sufficiency of the pleadings.").

Moreover, the primary purpose of Rules 8 and 10 of the Federal Rules of Civil Procedure is to provide the defendant fair notice of the claims against it and allow the court to sift through the plaintiff's claims to determine if the plaintiff has stated any claims upon which relief could be granted. *See, e.g.*, *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).  Thus, even at the earliest stages of litigation, courts should be hesitant to conclude that a complaint is an impermissible shotgun complaint when both the court and the defendant can understand the plaintiff's claims. *See, e.g.*, *Barclay v. First Nat. Bank of Talladega*, 2014 WL 5473829, at *7–8 (N.D. Ala. Oct. 28,

2014) (noting that, because the court can discern the plaintiff's claims and the defendant "has managed to separate out the claims in its motion to dismiss," the court need not require the claims to be amended).

In short, in both of the complaints, Sanders has stated plausible—if imperfectly pleaded—claims for relief. His failure to mechanically recite each element of each cause of action does not undermine the legal sufficiency of his claims on a Rule 12(b)(6) analysis, and the motion for judgment on the pleadings on these claims should be DENIED.

## B. Objections to Sanders' Affidavit

Walmart objects to paragraphs 3, 4, 5, 6, 9, 10, 12, 13, and 17 of Sanders' affidavit (Doc. 69-1) because they are not "based on personal knowledge, would be inadmissible in evidence for hearsay, relevance and other reasons, and/or relate to matters on which the affiant is incompetent to testify."[12] Doc. 71 at 1–2. In responding to a motion for summary judgment, the non-moving party may rely on affidavits, but they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Evidence that does not comply with the requirements of Rule 56(c) may be subject to an objection. *See Taylor*, 958 F. Supp. 2d at 1291. Once a party objects to the admissibility of evidence under Rule 56(c), "the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Campbell*, 546 F. App'x

---

[12] Walmart also references paragraph 11 of the affidavit in the concluding paragraph of its brief, but does not devote any discussion to this paragraph elsewhere in the brief. Thus, this reference appears to be in error, and the court therefore has not considered any objection to paragraph 11.

at 879 (citation and internal quotation marks omitted).

Paragraph 9 of Sanders' affidavit contains factual assertions that lack any apparent basis for personal knowledge. *See* Fed. R. Civ. P. 56(c)(4).  The affiant must state his basis of knowledge, and "an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact." *Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002); *see also Reeves v. Thigpen*, 879 F. Supp. 1153, 1164 (M.D. Ala. 1995) (finding "a statement merely indicating that an affidavit is based on information and belief is insufficient as a matter of law").  Paragraph 9 of Sanders' affidavit states that he has personal knowledge that store management "accommodated other associates who had to suffer an injury including a female associate who was accommodated by being placed on light duty because [of] an injury." Doc. 69-1 at 2.  Despite perfunctorily stating that he has personal knowledge, Sanders does not provide any actual basis for his personal knowledge, providing no facts on which the court might infer that Sanders knows the details of both his coworkers' past injuries and the subsequent accommodation process.  In response to Walmart's objections, Sanders offers only that he has personal knowledge based on "his observation as a longtime employee of Wal-Mart." Doc. 72 at 3.  This fails to remedy the ultimate issue—that Sanders has offered no support for his claimed knowledge.  For this reason, this portion of Sanders' affidavit is not in compliance with Rule 56(c).  Accordingly, Walmart's objection to paragraph 9 of Sanders' affidavit is due to be SUSTAINED.

The remaining objections are due to be overruled, however.  For example, Walmart

avers that Sanders' statements regarding alleged injuries that he suffered on the job are too vague to be relevant or material to his claims. *See* Doc. 71 at 5–7. Walmart is correct that Sanders' allegations provide limited detail on the nature of the injuries and their timing. However, this failure does not require the court to strike these allegations from the affidavit. Evidence is admissible if it is relevant, *see* Fed. R. Evid. 402, and evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Sanders' evidence concerning his injuries is relevant, of course, to his allegations that he suffered discrimination because of his disability and that Walmart did not provide reasonable accommodations in accordance with federal law. Indeed, Sanders' injury allegations are pivotal to his case.

Walmart nevertheless asks the court to strike these allegations for vagueness. Vague evidence might be flawed, but it may still be relevant and admissible. Moreover, Sanders' statements regarding the injury in the affidavit are illuminated by the allegations in his two complaints and the underlying charges of discrimination. The shortcomings of Sanders' affidavit may be reflective of the strength and probative value of his evidence, but not every bit of arguably weak or unpersuasive evidence is so vague or unhelpful as to be completely irrelevant under Rule 401. Accordingly, Walmart's objections to paragraphs 3, 4, 5, 6, 12, 13, and 16 of Sanders' affidavit are due to be OVERRULED.

For largely the same reasons, Walmart's objection to paragraph 10 also falls short. Paragraph 10 reads: "The co-managers and assistant managers at Walmart Store #700 [made] comments about me being a liability to the store." Doc. 69-1 at 2. While this

allegation is again vague and of limited probative value, it is potentially relevant to Sanders' claims to the extent it reveals a discriminatory motive on the part of store management in decisions concerning Sanders' employment.  Walmart's objection to paragraph 10 should therefore be OVERRULED.

Finally, the same reasoning applies to Walmart's objection to Sanders' identification of a second injury in paragraph 17, which reads:

> After a second work related injury, I was instructed by Walmart that I could not use my personal physician, instead, I had to use Dr. Davis physician selected by Walmart.  Dr. Davis would not recommend that I be placed on light duty, nor would he sign any documents to verify that I had to be absent because of my physical ailment.

Doc. 69-1 at 3.  Although Sanders' allegations regarding this injury are not detailed, the fact that he was injured is still relevant to his claims.  Additionally, Walmart contends that the first sentence of the paragraph contains an inadmissible hearsay statement.  However, the court is not satisfied that the statement could not be reduced to one of several admissible forms at trial. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (holding that inadmissible hearsay may be considered at summary judgment "if the statement could be . . . reduced to admissible form" at trial) (citations and internal quotation marks omitted). First, the statement might not be admitted to prove the truth of the matter asserted if Sanders offers it to explain why he did not obtain the required documentation prior to withdrawing his documentation request in October 2016. *See* Fed. R. Evid. 801(c); Doc. 58-1 at 44. Moreover, even if the statement were admitted to prove its truth, it could be admissible under one of the exceptions to the hearsay rule, such as the party-admission exception in the event a Walmart employee with sufficient authority to speak on behalf of the company

uttered the statement. *See* Fed. R. Evid. 801(d)(2) (providing that statements offered against an opposing party and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed" are admissible as non-hearsay).  Thus, because the statement could be reduced to admissible form at trial, Walmart's objection to paragraph 17 is due to be OVERRULED.

## C.   Motion for Summary Judgment

Because the factual and evidentiary support for the claims stated in the First Complaint closely parallel the facts and evidence for the Second Complaint, the court will combine its analysis for the summary judgment portion of this recommendation where a joint analysis is logical and more efficient.  After a thorough review of the record before it, the court concludes that no dispute of material fact exists and that Walmart is entitled to judgment as a matter of law.  It therefore recommends that Walmart's motion for summary judgment on all remaining claims be GRANTED.

### 1.   *Americans with Disabilities Act*

#### a.   Failure to Accommodate and Disparate Treatment

Sanders asserts both failure-to-accommodate and disparate treatment theories of disability discrimination under the ADA, contending that he was treated less favorably than similarly-situated coworkers. *See, e.g.*, Docs. 24 at 7 & 1-1 at 3 (17-cv-31).  The crux of both lawsuits is that Walmart twice failed to accommodate his disability, once in 2015 and once in 2016, and that Walmart terminated him in retaliation for filing a charge of discrimination with the EEOC in April 2016.  In addition, Sanders asserts that a lighter-skinned coworker was permitted to use the same type of electric cart that Sanders was

prohibited from using, and that multiple coworkers who violated Walmart's attendance policy were not terminated, while Sanders was. *See* Doc. 1-1 at 3 (17-cv-31).  The court will consider Sanders' failure-to-accommodate and disparate treatment allegations in tandem, as the *prima facie* case for both theories of ADA liability require proof of the same elements. *See, e.g.*, *Haines v. Cherokee Cnty.*, 2010 WL 2821853, at *10 (N.D. Ga. Feb. 16, 2010).

Title I of the ADA prohibits discrimination "against a qualified individual on the basis of disability" in the course of one's employment. *See* 42 U.S.C. § 12112(a).  "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1256 (11th Cir. 2007).  Sanders must demonstrate each element by a preponderance of the evidence. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999).

### i.     Disability

Where the underlying events took place on January 1, 2009 or later, the court applies the ADA Amendments Act of 2008 ("ADAAA"). *Mazzeo v. Color Resolutions Intern., LLC*, 746 F.3d 1264, 1267 (11th Cir. 2014).  A person is "disabled" under the ADAAA if he has a physical or mental impairment that substantially limits[13] one or more major life

---

[13] "Substantially limits" means "significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii).

activities,[14] he has a record of an impairment, or he is regarded as having such an impairment. 42 U.S.C. § 12102(1).  Sanders has alleged, both in the complaints themselves and the underlying EEOC charges, that he was disabled.  In the First Complaint, Sanders states that he was "injured twice while performing job-related duties, once in 2013 and most recently in 2016." Doc. 24 at 1.  The first injury was a back-muscle strain that prompted a worker's compensation claim, which was eventually closed. Doc. 24 at 3.  The injury was exacerbated in 2014, but was not recorded by Walmart because it occurred while Sanders was not working. Doc. 24 at 4.  Sanders informed management of this injury in 2014 and claims that he was unable to lift more than 40 pounds. Doc. 24 at 4.  Sanders believes that Joiner placed him on forced medical leave in 2015 because his injury required him to wear a brace on his neck and back. Doc. 24 at 5.  He was injured again in 2016, prompting him to visit his primary care physician and the emergency room. Doc. 24 at 6–7.  Only Sanders' injuries in 2015 and 2016 are relevant to his claims in this lawsuit.

For the 2015 accommodation request, Sanders' allegations regarding his disability are supported primarily by Walmart's submissions in support of its motion for summary judgment.  A statement submitted by Sanders' physician in October 2015 reflects that his medical condition necessitated limitations at work, including a 10-pound lifting restriction. *See* Doc. 58-12.  This triggered Sanders' first accommodation request. *See* Docs. 58-6 at 2 & 58-13 at 2.  These limitations were later acknowledged in a Sedgwick letter to Sanders,

---

[14] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 29 C.F.R. § 12102(2).

which noted his "need to take intermittent leave due to a serious health condition that [made him] unable to perform the essential functions of [his] job." Doc. 58-17 at 2.  As a result, his application for FMLA leave was approved on April 22, 2016. *See* Doc. 58-17 at 2–3. Accordingly, the court concludes that there is sufficient evidence in the record demonstrating that Sanders was disabled when he requested an accommodation in 2015.

There is no evidence in the record, however, demonstrating that Sanders was disabled when he requested an accommodation and then withdrew his request in 2016.  The only evidentiary materials relevant to Sanders' health at the time of this accommodation request are three reports from Dr. Davis in August, September, and October 2016, which show no restrictions and clear Sanders for normal duty. *See* Doc. 58-2 at 10–12.  Sanders stated in his deposition that he saw Dr. Singh and made several trips to the emergency room during this time period, but has not submitted any record of these visits. *See* Doc. 58-1 at 47.  The only record from Dr. Singh in 2016 before the court is the certification form for Sanders' April 2016 FMLA leave request, *see* Doc. 58-16, which Sedgwick granted for the time period from March 3, 2016 to September 2, 2016. Doc. 58-17 at 2.  Accordingly, there is no evidence before the court that Sanders was disabled within the meaning of the ADA when he requested an accommodation in 2016.

### ii.    Qualified Individual

To demonstrate that he is a qualified individual, Sanders must show "either that he can perform the essential functions of his job without accommodation, or, failing that, that he can perform the essential functions of his job with a reasonable accommodation." *Holly*, 492 F.3d at 1256 (citation and internal quotation marks omitted).  "An accommodation is

only reasonable if it allows the disabled employee to perform the essential functions of the job in question." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).  If, even with an accommodation, Sanders is unable to perform the essential functions of his job, "he is, by definition, not a qualified individual and, therefore, not covered under the ADA." *Holly*, 492 F.3d at 1256 (citation and internal quotation marks omitted).  Reasonable accommodations may include "job restructuring, part-time or modified work schedules, and reassignment to a vacant position," but "[w]hat constitutes a reasonable accommodation depends on the circumstances." *Id.* (quoting 42 U.S.C. § 12111(9)(B)).

The record demonstrates that Sanders was a qualified individual for the 2015 accommodation request, when Walmart accommodated Sanders by reassigning him. Sanders first requested FMLA leave for the period from October 8, 2015 to October 28, 2015. Doc. 58-10 at 2.  However, on October 10, Sanders requested reassignment instead.[15] *See* Docs. 24 at 5 & 58-1 at 18.  ASC and Joiner granted Sanders' request and reassigned him to the people greeter position two weeks later on October 26.[16] *See* Docs. 24 at 6 & 58-5 at 16.   When reassignment is sought, the court determines whether the employee is qualified for the new position, not his current position. *See, e.g.*, *U.S. Equal Emp't Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1344 (11th Cir. 2016).  The record reflects that

---

[15] In his deposition, Sanders stated that he does not remember requesting leave and that Joiner "sent [him] home." Doc. 58-1 at 18.  This is also reflected in the First Complaint, which stated that Joiner "placed Plaintiff on FMLA leave, effective October 8, 2015." Doc. 24 at 5.  However, there is no evidence in the record that Joiner involuntarily placed Sanders on leave or that Sanders himself did not initiate the leave request in October 2015.

[16] In fact, the ASC initially informed Sanders that he was eligible for reassignment due to his limitations, but that no suitable positions were available. *See* Doc. 58-4 at 8.  Ultimately, the store opened a position specifically for Sanders. *See* Doc. 58-3 at 4.

Sanders performed the role of people greeter without issue for several months after Walmart reassigned him and that Walmart's reassignment process specifically required that an employee be qualified for the position to which he is reassigned. The court may reasonably infer from this evidence that Sanders was qualified for the people greeter position.

After serving as a people greeter, Joiner promoted Sanders to an overnight maintenance supervisor position on March 5, 2016. Doc. 58-2 at 3. Sanders accepted the position and performed it "to the best of [his] ability." Doc. 58-1 at 54–56. It was in this position that Sanders contends that he needed to use an electric cart reserved for store customers because walking on concrete floors caused knee pain and aggravated his back injury. *See* Docs. 24 at 6–7 & 58-1 at 43. After discovering that Sanders was using the cart, Joiner informed Sanders that he did not have the authority to approve this accommodation and provided Sanders with a Request for Accommodation packet and form. Doc. 58-2 at 43. After Sanders failed to complete and submit the form, Joiner placed him on a leave of absence, notified ASC of the accommodation request, and referred Sanders to Joe Rubino. *See* Doc. 48-1 at 44 & 48. Eventually, Sanders informed ASC that he wanted to return to work because he could not submit the proper medical documentation to support his request. *See* Docs. 48-1 at 48 & 58-2 at 5.

Despite the fact that Sanders withdrew his accommodation request in 2016, the court will analyze whether he could perform the essential functions of the overnight maintenance supervisor position with or without a reasonable accommodation. "[E]ssential functions are the fundamental job duties of a position that an individual with a disability is actually

required to perform." *Holly*, 492 F.3d at 1257 (citations and internal quotation marks omitted). According to the ADA, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description . . . , this description shall be considered evidence of the essential functions of the job." 42 U.S.C.A. § 12111(8). Whether a specific function is essential is determined by five factors:

> (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs.

*Holly*, 492 F.3d at 1258 (citations and internal quotation marks omitted). Here, as in *Holly*, many of these factors are inapplicable. For example, there is no information in the record regarding the terms of an applicable collective bargaining agreement or the work experience of incumbents in identical or similar jobs.

The overnight maintenance supervisor position involved the following essential functions:

> Cleans all areas of the facility both inside and outside (for example, floors, windows, restrooms, trash receptacles, dock area) utilizing tools, machines, and company-approved chemicals and performs maintenance on machines and other equipment in accordance with company policies and procedures. Utilizes and maintains floor-cleaning equipment including scrubbers, waxers, and rug extractors to scrub and wax floors and clean carpets.

Doc. 58-3 at 23. Among the position's "necessary" physical activities are "fine motor skills and hand-eye coordination"; "bending, twisting, pulling, and stooping"; and "mov[ing], lift[ing], carr[ying], and plac[ing] merchandize and supplies weighing up to 25 pounds

without assistance." Doc. 58-3 at 23.   The work environment may include "sloping, uneven, or slippery surfaces." Doc. 58-3 at 23.   Sanders has not disputed that these are the essential functions of the overnight maintenance supervisor job or that he was capable of performing them with or without a reasonable accommodation.   Instead, Sanders focuses his argument solely on store management's refusal to permit him to use a motorized cart in 2016, presumably contending that he could perform the essential functions of his job if allowed to use the cart.   Indeed, Joiner testified that Sanders informed him that he could not perform his job without use of the cart. *See* Doc. 58-2 at 4.

However, it is not sufficient for Sanders merely to allege that an accommodation is reasonable and would allow him to perform the essential functions of the job.   "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of [his] job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (citation omitted).   Sanders has made neither showing.   It is well established that the employer need not "accommodate an employee in any manner in which that employee desires," nor is it required to "change the essential functions of a job." *Id.* (citations and internal quotation marks omitted).   Thus, Walmart was not required to allow Sanders to use the cart just because Sanders wanted to use it.   And Sanders has not shown that his use of the cart would not interfere with his ability to perform the essential functions of the position, including extensive cleaning, bending and stooping, and moving, lifting, and carrying up to 25 pounds of merchandise on potentially sloping, uneven, or slippery surfaces.

Even if he had made such a showing, the record demonstrates that Sanders was given the opportunity to provide the necessary medical documentation to support an accommodation request for use of a cart, but was unable to do so.[17] *See* Docs. 58-1 at 48 & 58-2 at 5.  As a result, ASC and Joiner presented Sanders with two options: he could return to work without use of the cart but with his own assistive device (such as his own scooter or electric cart), or he could apply for FMLA leave. *See* Doc. 58-2 at 5 & 15. Sanders voluntarily chose to return to work in lieu of the accommodation offered to him— a decision that severely undercuts his failure-to-accommodate claim. *See, e.g.*, *Noel v. BNY-Mellon Corp.*, 2011 WL 4633884, at *2 (S.D.N.Y. Oct. 4, 2011) ("Under the ADA, an employee who withdraws from the interactive process cannot later allege failure to accommodate."); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 579 (S.D.N.Y. 2008) (noting that an employee's provision of medical documentation is "indispensable" and "where an employee fails to provide documentation sufficient to allow an employer to assess the parameters of the employee's disability, ADA liability simply does not follow").  For all of these reasons, Sanders has not demonstrated that he was a qualified individual with respect to the 2016 accommodation.

---

[17] As already stated, Sanders believes that he could not submit the necessary documentation because Walmart prevented him from seeing his own physician, Dr. Singh, and instead "instructed" him to see Dr. Davis. *See* Docs. 58-1 at 44 & 69-1 at 3.  Sanders has somewhat contradicted this assertion in claiming that he believes Dr. Singh did not submit the certification paperwork because Sanders was "under a worker's comp[ensation] doctor," but that he does not "know for sure." Doc. 58-1 at 44.  He asserts that Dr. Davis repeatedly refused to credit his complaints of pain and "told me there was nothing wrong with me and that I had to come to work." Doc. 58-1 at 43.  Sanders disputes Dr. Davis's findings. *See* Doc. 38-1 at 43 & 45. Sanders, however, has provided no evidence beyond his own speculation that Walmart prohibited him from seeing Dr. Singh, that it prevented Dr. Singh from submitting the required paperwork, or that Dr. Davis's findings were incorrect or motived by bias.

### iii.    Unlawful Discrimination

Despite concluding that Sanders satisfied the first two elements of the *prima facie* case for his 2015 accommodation request, the court recommends summary judgment in Walmart's favor on his ADA claims because he has not presented any evidence of unlawful discrimination.  An employer unlawfully discriminates against a qualified employee if it does not reasonably accommodate the employee unless it can demonstrate that an accommodation would cause "undue hardship." *Holly*, 492 F.3d at 1262.  Of course, it is Sanders' burden to identify an accommodation and show that it is reasonable. *Id.* "Assuming [he] cannot do so, the employer has no affirmative duty to show undue hardship." *Id.*    However, Sanders' burden does not end there.  He must also show that he was discriminated against because of his disability—"that, but for [Walmart's] failure to accommodate his disability, he would not have been terminated." *Id.* at 1263 n.17; *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) ("Liability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision.") (citation and internal quotation marks omitted).  Here, Sanders has failed to make either showing with respect to both accommodation requests.

Sanders does not dispute that Walmart accommodated his request in 2015 to be reassigned to a different position based on his disability.  Nevertheless, in his summary-judgment response, Sanders seems to argue that the time that elapsed between his request for an accommodation and the reassignment constitutes an unreasonable delay, though he offers no authority for this proposition. *See* Doc. 68 at 30.  Sanders was placed on paid leave for roughly two weeks while Walmart sought a reasonable accommodation and

ultimately reassigned him to the people greeter position. *See* Doc. 58-5 at 16.  But while an unreasonably long delay may give rise to a failure-to-accommodate claim, not all delays are unreasonable, and courts have routinely found significantly longer delays to be reasonable as a matter of law. *See, e.g.*, *Marks v. Washington Wholesale Liquor Co. LLC*, 2017 WL 2312860, at *11 (D.D.C. May 26, 2017) (holding that a "brief 17-day period simply cannot support a failure-to-accommodate claim based on unreasonable delay"); *Anderson v. Bellsouth Telecomms., LLC*, 2015 WL 461698, at *11–13 (N.D. Ala. Feb. 4, 2015) (gathering cases and finding that Eleventh Circuit courts "have sanctioned delays as long as several months as a matter of law"); *Kintz v. United Parcel Serv., Inc.*, 766 F. Supp. 2d 1245, 1256–57 (M.D. Ala. 2011) (concluding that the employer's "delay of a mere 15 days is not unreasonable under the ADA"); *Hartsfield v. Miami-Dade Cnty.*, 90 F. Supp. 2d 1363, 1373 (S.D. Fla. 2000) (holding the same for a delay of several months). Accordingly, the court concludes that the delay here—just two weeks—between Sanders' 2015 request for an accommodation and his reassignment is not unreasonable as a matter of law.

Moreover, because Sanders was unable to demonstrate that he was "otherwise qualified" with respect to his 2016 accommodation, the court need not discuss the "unlawful discrimination" prong for this request. *See Holly*, 492 F.3d at 1262.  Even if he had, Sanders has failed to satisfy his burden to identify an accommodation and demonstrate that it is reasonable.  Accordingly, because Sanders has not satisfied the requirements for a *prima facie* disability discrimination claim for either of his accommodation requests, summary judgment on his failure-to-accommodate and disparate treatment claims is due to

be GRANTED in favor of Walmart.[18]

### b.    Retaliation

In the Second Complaint, Sanders alleges that Walmart discriminated against him and eventually terminated him in retaliation for filing the EEOC charge of discrimination on April 20, 2016 and for requesting an accommodation in October of that year. *See* Docs. 1-1 at 2 (17-cv-31) & 24 at 7.   The ADA prohibits discriminatory treatment against an employee because that employee has filed a charge of discrimination. *See* 42 U.S.C. § 12203.   A *prima facie* case of retaliation requires proof that "(1) [the employee] engaged in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the adverse action and his protected expression." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001).   A request for an accommodation and the filing of a charge of discrimination with the EEOC[19] both satisfy the first element, and a showing of but-for causation satisfies the third element. *Frazier-White*, 818 F.3d at 1258 (citations omitted).

It is undisputed that Sanders was terminated in October 2016, that he requested an accommodation in 2015 and 2016, and that he filed his first charge of discrimination in April 2016.   Thus, the first two elements of the *prima facie* case are satisfied.   Walmart

---

[18] The burden-shifting analysis applicable to Title VII race discrimination claims also applies to ADA disparate treatment claims. *See Nadley v. Harvey*, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007); *Holly*, 492 F.3d at 1262 (holding that the *McDonnell Douglas* burden-shifting framework applies in disparate treatment cases but not in failure-to-accommodate cases); *Haines*, 2010 WL 2821853, at *9 ("Although the *McDonnell Douglas* framework applies to disparate treatment claims under the ADA, the *McDonnell Douglas* framework is inapplicable in failure to accommodate cases under the ADA."). However, because all of Sanders' disability discrimination claims fail at the *prima facie* stage, the court need not proceed to the *McDonnell Douglas* burden-shifting analysis on his disparate treatment claims.
[19] *See Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).

disputes the third element, arguing that a six-month delay between the protected expression and adverse employment action is not close enough to demonstrate causation. Doc. 65 at 30.

"The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). However, where temporal proximity alone is purported to establish causation, the proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation and internal quotation marks omitted). Sanders has submitted no evidence of causation beyond his own speculation and conjecture. Thus, he must rely on temporal proximity alone, arguing that the charge of discrimination he filed in April 2016 led to his termination in October, six months later. Six months is insufficiently close to establish causation as a matter of law. *See id.* (gathering cases holding that delays of three and four months are insufficient); *Thomas*, 506 F.3d at 1364 ("[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law."). However, Sanders also requested an accommodation—albeit imperfectly—in early October 2016, when he asked store management for permission to use the customer cart on the job. This request significantly tightens his timeline, as the termination followed later that month. Thus, viewing the evidence in the light most favorable to Sanders, the temporal proximity of his October 2016 accommodation request and October 2016 termination creates a triable issue of fact as to causation.

Nevertheless, Sanders' retaliation claim falters under the *McDonnell Douglas* burden-shifting framework because Walmart has offered a legitimate, nondiscriminatory reason for terminating Sanders, and Sanders has failed to demonstrate that Walmart's reasoning is a pretense for disability discrimination. *See McDonnell Douglas*, 411 U.S. at 802–05.  Sanders contends that he requested to use the customer cart at the beginning of October, but that he could not submit the necessary medical documentation in support of his request. *See* Doc. 1-1 at 2 (17-cv-31).  After Sanders returned to work, Joiner learned that Sanders' requested FMLA leave after September 6, 2016 had been denied by Sedgwick, and he placed Sanders on paid leave pending an investigation into his absences. Docs. 1-1 at 2 & 58-2 at 5–7.  Ultimately, Joiner decided to terminate Sanders' employment for accruing 63 unexcused occurrences during a six-month period in violation of Walmart's attendance policy. Docs. 1-1 at 2 & 58-2 at 7.  Neither Sedgwick nor ASC were aware of Sanders' 2016 charge of discrimination and lawsuit. Doc. 58-2 at 7.

Rather than attempting to show that Walmart's justification for his termination is pretextual, Sanders argues that Walmart's justification "is not valid" because Walmart "assigned a physician to Mr. Sanders who refused to cooperate with Mr. Sanders in regards to his inability to work because of the pain from his injury." Doc. 68 at 32.  In support of this argument, Sanders relies on the portions of his affidavit in which he alleges that Joiner assigned him physically demanding employment tasks and Walmart's physician would not sign paperwork demonstrating that his absences were medically necessary. *See* Doc. 69-1 at 2–3.  Sanders' evidence on this point, which consists of unsubstantiated statements in both his affidavit and deposition, fails to demonstrate that the actions taken by Joiner or

Walmart's physician were motivated in any way by Sanders' prior accommodation requests or EEOC complaints.  Sanders' statements amount to nothing more than his own speculation and suppositions regarding the decision to terminate him.  This does not meet Sanders' obligations to provide "concrete evidence in the form of specific facts" instead of "mere conclusory allegations and assertions." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009) (citations and internal quotation marks omitted).  Indeed, "conclusory allegations or unsupported assertions of discrimination, without more, do not raise an inference of pretext." *Gilliard v. Ga. Dept. of Corr.*, 500 F. App'x 860, 865 (11th Cir. 2012); *see also Whiteman v. Cingular Wireless, LLC*, 2006 WL 6937181, at *12 (S.D. Fla. May 4, 2006) (citing *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 (5th Cir. 1995)) ("The Plaintiff's subjective belief that discriminatory intent motivated the employer's actions is insufficient to establish a material question of fact.").  Rather, Sanders had to "meet the proffered reason head on and rebut it." *Id.* (citation and internal quotation marks omitted).  He has not done so, and this failure is fatal to his ADA retaliation claim. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).

### 2.     *Family and Medical Leave Act*

Sanders also brings a claim under the FMLA, alleging that Walmart interfered with his right to take FMLA leave by appointing a worker's compensation doctor who indirectly prevented Dr. Singh from completing the necessary paperwork. *See* Docs. 24 at 7 & 68 at 29–30.  Although he often confuses the accommodation request and leave request processes, *see* Doc. 58-1 at 50 (stating that he "thought it was all the same"), the court interprets this claim to relate to the denial of FMLA leave for all absences after September

6, 2016. *See* Doc. 68 at 30 (stating that Sanders disputes the "validity of the denials of FMLA leave that resulted, in large part, in his accumulation of excessive absences and termination").   Sanders contends that, once Walmart had assigned him a worker's compensation doctor, Dr. Singh "could not do anything other than treat me." Doc. 58-1 at 51–52.   He also claims that Walmart prevented him from seeing Dr. Singh generally. *See* Doc. 69-1 at 3.

The FMLA permits eligible workers to take up to 12 weeks of unpaid annual leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161, 1166 (11th Cir. 2014) (citations and internal quotation marks omitted).   To enforce this right, the FMLA provides a cause of action for interference or retaliation. *Id.*   "To prove FMLA interference, an employee must demonstrate that he was denied a benefit to which he was entitled under the FMLA." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1266–67 (11th Cir. 2008) (citations omitted).   It is irrelevant whether the employer intended to deny the right. *Id.* at 1267.

Sanders has offered no evidence that he was entitled to the FMLA recertification he requested, and instead relies on mere speculation that Walmart or Dr. Davis in some way interfered with Dr. Singh's completion of the necessary paperwork.  Sanders' speculation, of course, is insufficient at the summary-judgment stage to create a triable issue of fact as to whether he was entitled to leave under the FMLA.  In fact, there are three separate reports from Dr. Davis from August to October 2016 indicating that Sanders was healthy enough for normal duty. *See* Doc. 58-2 at 10–12.  Thus, because Sanders has failed to make the

requisite showing that he was entitled to the leave he sought, the court recommends that Walmart's motion for summary judgment on any claim for FMLA interference be GRANTED.[20]

### 3. *Title VII*

Sanders alleges that Walmart violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, when it discriminated against him by terminating his employment on the basis of race. Doc. 1-1 at 1 (17-cv-31); 42 U.S.C. § 2000e–2(a)(1).  Under Title VII, Sanders may prove that Walmart discriminated against him by presenting either direct or circumstantial evidence of race discrimination. *See, e.g.*, *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1288 (11th Cir. 2003).

The court need not proceed to a substantive analysis of Sanders' Title VII claims, however, as he has abandoned these claims on summary judgment.  A plaintiff abandons any claims he fails to address in a summary-judgment response brief. *See Brackin v. Anson*, 585 F. App'x 991, 994–95 (11th Cir. 2014) (holding that the plaintiff abandoned claims by failing to "make any argument based on relevant legal authority, or identify any material issues of fact" in his response after the defendant moved for summary judgment); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is on the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Exford v. City of Montgomery*, 887 F. Supp. 2d 1210, 1220 (M.D. Ala. 2012) (deeming abandoned all claims the plaintiff

---

[20] To the extent Sanders' allegations could also be construed to state a claim for retaliation under the FMLA, the same analysis employed above for his ADA retaliation claim would foreclose that claim.

"refused to defend" in response to a motion for summary judgment).

In Sanders' response brief, he made absolutely no attempt to defend any claim for race discrimination under Title VII. In fact, Sanders' only arguments concerning Title VII are in response to Walmart's motion for judgment on the pleadings, asserting in conclusory fashion that he has satisfied the administrative prerequisites for Title VII and that the "Title VIII [sic] Claims in Plaintiff's Amended Complaint or Second Complaint do not fail." Doc. 68 at 11. He makes no mention of Title VII or race discrimination in the summary-judgment portion of his brief, *see* Doc. 68 at 29–33, nor does Sanders discuss race discrimination in his affidavit or deposition. Of course, it is well established under Rule 56 that "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (citations and internal quotation marks omitted). Thus, the court concludes that this claim has been abandoned and recommends that Walmart's motion for summary judgment be GRANTED as to this claim.

## V.  CONCLUSION

For the reasons stated above, the undersigned Magistrate Judge recommends as follows:

1.      That Walmart's motion for judgment on the pleadings (Doc. 57) be GRANTED in part and DENIED in part;

2.      That Walmart's motion for summary judgment (Doc. 57) be GRANTED, and that all claims asserted by Plaintiff Morris Sanders be DISMISSED with prejudice;

3.     That the objections contained in the motion to strike (Doc. 71) be SUSTAINED in part and OVERRULED in part, as set forth herein; and

4.     That this case be deconsolidated by the Clerk of Court before a final judgment is entered.

It is further ORDERED that the parties are DIRECTED to file any objections to the report and recommendation not later than **February 2, 2018**.  Any objections filed must specifically identify the findings in the Magistrate Judge's report and recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this report and recommendation is not a final order of the court, and therefore, is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report and recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the report and recommendation and shall bar the part from attacking on appeal factual findings in the report and recommendation accepted or adopted by the District Court, except upon grounds of plain error or manifest justice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE this 19th day of January, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

45